# In the United States Court of Federal Claims

<table>
<tr><td>

HAWAIIAN DREDGING
CONSTRUCTION COMPANY, INC,

          *Plaintiff,*

v.

THE UNITED STATES,

          *Defendant.*

</td><td>

No. 22-339
(Filed: February 14, 2023)

</td></tr>
</table>

*Michael Charles Zisa*, Washington, DC, for Plaintiff.

*Jimmy S. McBirney*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

## OPINION AND ORDER

**LERNER,** *Judge.*

    This is a case under the Contract Disputes Act ("CDA"), 41 U.S.C. § 7101, involving a firm fixed-price, design-build contract (the "Contract") between Plaintiff Hawaiian Dredging and Construction Company ("HDCC") and the United States Department of Transportation, acting through the Federal Highway Administration, Central Federal Lands Highway Division ("CFLHD" or the "Agency"). HDCC seeks review of the contracting officer's final decision ("COFD") denying its claim for an equitable adjustment. It believes that it is entitled to an equitable adjustment to the Contract "to compensate HDCC for delays and increased costs incurred as a result of changes in the work." Am. Compl. ¶ 30, ECF No. 14.

    The Government moves to dismiss the Amended Complaint under Rule 12(b)(6) of the United States Court of Federal Claims ("RCFC"). It argues that Plaintiff fails to state a claim upon which relief may be granted because it "bore the risk of increased costs" under the Contract, and "does not plausibly allege any directed or constructive contract changes, or that HDCC performed any uncompensated work outside the scope of its contractually mandated responsibilities." Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1, ECF No. 15.

    For the reasons set forth below, the Motion to Dismiss is **GRANTED**, and the case is **DISMISSED without prejudice**.

I.      **Factual Background**[1]

   A.      **The Project**

   HDCC was the general contractor for the Lahaina Bypass 1B-2 design-build construction project in Lahaina, Maui, Hawaii (the "Project" or "Lahaina Bypass"). Am. Compl. ¶ 4. This was a fixed-unit-price, design-build highway project in the amount of $38,671,000. *Id.* The goal of the Project was to relocate the terminus of the Lahaina Bypass to stop shoreline erosion, coastal hazards, and traffic congestion on the Honoapiilani Highway. *Id.* at ¶ 6. The Project anticipated extending the existing road on both sides, constructing an overpass and box culverts, grading for drainage, and installing road and bridge safety features. *Id.* at ¶ 7. To do this work, HDCC alleges it required final Rights of Way ("ROWs") from landowners near the highway, relocation of overhead utilities, and local, state, and federal permits. *Id.* at ¶¶ 8–9. On May 25, 2018, the Project opened to the public, and by July 24, 2018, HDCC's Contract work was substantially complete. *Id.* at ¶ 10.

   B.      **The Solicitation and Competition**

   On October 1, 2015, CFLHD, in partnership with the Hawaii Department of Transportation ("HDOT"), issued a Request for Qualifications ("RFQ") seeking potential contractors to participate in the pre-qualification phase of the Project. Def.'s App. at 166–68, ECF No. 15-1. Plaintiff alleges that CFLHD "represented that it would acquire the necessary ROWs prior to issuance of the [notice to proceed]." Pl.'s Resp. to Mot. to Dismiss ("Pl.'s Resp.") at 10, ECF No. 18 (citing Pl.'s Ex. A at 5-6, ECF No. 14-1); *see also* Am. Compl. ¶ 35. Plaintiff quotes from the RFQ:

   > There are two (2) right-of-way acquisitions required within the limits of this project; one private landowner and Maui County (*sic*). The right-of-way acquisition is expected to be completed prior to the issuance of the RFP [Request for Proposals].

Pl.'s Ex. A at 2 (quoting Def.'s App. at 167) (emphasis removed).

   On December 7, 2015, HDCC was short-listed to participate in Phase Two of the solicitation. *Id.* On December 18, 2015, CFLHD, in partnership with HDOT, issued a Request for Proposals ("RFP" or "Solicitation"). *Id.* The "Government Furnished Information" section of the RFP stated:

---

[1] This section does not set forth factual findings. Rather, it describes the case in terms of the facts alleged in the Amended Complaint, which must be taken as true, with all reasonable inferences construed in Plaintiff's favor on a motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

Due to their size these files will be placed on CD and sent to each firm.
- o   Right of Way Dedication of Deed documentation
- o   Final Environmental Assessment/finding of No Significant Impact
- o   Survey Data
- o   Alternative No. 3 Profile

*Id.*; Pl.'s Ex. 1 at A-11, ECF No. 28-1 (RFP).  The RFP also required that:

(1) Each proposal include "the plan and profile of the roadway alignment, including typical sections" and the "proposed alignment and maintenance limits as it relates to available right-of-way"; and

(2) The Contractor locate and identify all utilities within the project area and "cooperate with utility owners to expedite the relocation and adjustment of their utilities to minimize interruption of service, duplication of work, and delays if relocations or adjustments are needed" and "prepare utility agreements for [CFLHD], to be executed by HDOT."

Pl.'s Resp. at 4 (quoting Pl.'s Ex. A at 3) (cleaned up); *see also* Pl.'s Ex. 1 at A-14, E-11 (RFP). HDCC alleges that the Alternative No. 3 Profile was a "map depicting a roadway alignment which had been previously prepared for, and included as part of, HDOT's Final Environmental Assessment/Finding of No Impact . . . covering the Project."  Pl.'s Ex. A. at 2.

On April 26, 2016, HDCC submitted its Price Proposal and a Technical Proposal.  Pl.'s Ex. A at 3.  HDCC alleges that its Technical Proposal "included a detailed roadway plan and repeatedly and unequivocally stated that the basis for the proposed roadway alignment was Alternative No. 3 as described in the Finding of No Impact furnished by CFLHD at the time of issuance of the RFP."  *Id.* at 3 (cleaned up).  Plaintiff states that when it submitted its bid, it believed that CFLHD had already secured the required ROW documents and permits—or would at least do so prior to issuing the notice to proceed—and that neither the Government nor HDCC were required to obtain grading permits from the County of Maui.  Pl.'s Ex. A at 6.  In fact, these requirements were not completed until after contract performance commenced.  *Id.*

### C.    The Contract

On June 3, 2016, CFLHD awarded HDCC the Contract.  Pl.'s Ex. A at 3.  CFLHD issued notice to proceed on June 29, 2016.  *Id.*  The Contract incorporated Federal Acquisition ("FAR") 52.236-7, Permits and Responsibilities, which states:

> The Contractor shall, without additional expense to the Government, be
> responsible for obtaining any necessary licenses and permits, and for complying
> with any Federal, State, and municipal laws, codes, and regulations applicable to
> the performance of the work.

Def.'s App. at 38 (Contract).  The Contract contemplated that the Government would execute final ROWs, but also required HDCC to "[p]repare right of way plans and any legal descriptions documents to facilitate the final acquisition of the design and permanent right of way to accommodate the maintenance and operation of the facility by . . . HDOT"; "[p]repare the documents according to HDOT standards and specifications"; and "[o]btain any required title work and field work to complete a boundary study if required by HDOT."  *Id.* at 96 (Contract clause 111.11, Right of Way).  The Contract also required the contractor to "prepare utility agreements for CFLHD, to be executed by HDOT," and "[c]ooperate with utility owners to expedite the relocation or adjustment of their utilities to minimize interruption of service, duplication of work, and delays if relocations or adjustments are needed."  *Id.* at 80 (Contract clause 107.02, Protection and Restoration of Property and Landscape).

### D.    The CDA Claim

On July 17, 2020, HDCC filed a CDA claim requesting an equitable adjustment for various delays and increased costs during its Contract performance.  Pl.'s Ex. A at 1–15.  HDCC alleges that the Government's failure to secure the ROWs in a timely manner caused delays in obtaining Clean Water Act permits and relocating utilities.  *Id.* at 5–7, 9–12.  HDCC also alleged that it suffered delays and increased costs due to differences between the final ROWs and the preliminary ROW documents provided in the Solicitation. *Id.* at 7–9.  Finally, it argued that it experienced excusable delays between Substantial Completion and Final Completion of the Project because the Government ordered changes and additions to the Contract work relating to a retaining wall owned by Maui Electric Company ("MECO wall"), grading work fronting "the Castleton Property" on Kai Hele Ku Street, and a retaining wall on a different part of the Castleton Property.  *Id.* at 12–13.  According to HDCC, these various delays, in turn, led to critical path delay on the Project.  Am. Compl. ¶¶ 21, 23.[2]  On March 30, 2021, the contracting officer issued its COFD denying HDCC's CDA claim.[3]  Am. Compl. ¶ 16.

---

[2] "Critical path" refers to work items in a construction schedule which, if delayed, will cause delay in reaching Substantial Completion of the project.

[3] The CDA claim also requested a twelve-day extension of time and remission of liquidated damages for the Agency's delay in issuing the Notice to Proceed.  *See* Pl.'s Ex. A at 4–5.  The COFD granted this request but denied all other claims.  Pl.'s Ex. B at 23–24, ECF No. 14-2.

### E.     Procedural History

On March 29, 2022, Plaintiff filed its Complaint in this Court, followed on July 22, 2022, by its First Amended Complaint.  Plaintiff requests an equitable adjustment, monetary damages, and time extensions for changed work and breach of contract.  It seeks a range of damages and specific costs totaling $6,576,968; 190 compensable and excusable days of delay; 482 days of excusable delay; interest; and attorneys' fees and costs.  Am. Compl. ¶ at 11.

## II.     Jurisdiction

The Tucker Act grants this Court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under" the CDA.  28 U.S.C. § 1491(a)(2); *see also* 41 U.S.C. § 7102(a) (providing that the CDA applies to "any express or implied contract . . . made by an executive agency for . . . the procurement of services").  "If a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must demonstrate compliance with the mandatory requirements of the [CDA]."  *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 153 (2013), *aff'd*, 741 F.3d 1380 (Fed. Cir. 2014).  The CDA requires that a contractor bring an action in federal court "within 12 months from the date of receipt of a contracting officer's decision."  41 U.S.C. § 7104(b)(3).  Further, this Court's jurisdiction over a CDA claim "requires both a valid claim and a contracting officer's final decision on that claim."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  The Court has jurisdiction over Plaintiff's Amended Complaint under the Tucker Act and CDA because the case arises from a contract between HDCC and the United States, there was a valid claim and COFD, and Plaintiff filed its Complaint in this Court within 12 months of receiving the COFD.

## III.     Discussion

The Amended Complaint alleges that the Contract's Changes clause entitles Plaintiff to an equitable adjustment (Count I) and damages for breach of contract (Count II).  Read together, the Amended Complaint and CDA Claim constitute several distinct claims which Plaintiff argues entitle it to relief.[4]  Plaintiff only relies on the Changes clause as grounds for either an equitable adjustment or the basis for breach of contract.  *See* Am. Compl. ¶¶ 18–20, 30.  It also alleges that the Government breached its implied duty of good faith and fair dealing.  Pl.'s Ex. A at 13–14.  In claiming breach of contract, the Amended Complaint does not specify any other contract provision, express or implied warranty, or law that the Government allegedly breached or violated.  Instead, it broadly asserts that "[t]he Final Decision is in breach of the Contract, breach of CFL[HD]'s express and implied warranties to HDCC, and in violation of the FAR and other

---

[4]  The Amended Complaint originally incorporated the CDA Claim's request for a 12-day extension of time and remission of liquidated damages for the Agency's delay in issuing the notice to proceed.  *See* Am. Compl. ¶¶ 32, 36; Pl.'s Ex. A at 4–5.  The COFD granted this request, Pl.'s Ex. B at 23–24, and Plaintiff clarified in its supplemental brief that this claim is not at issue, Pl.'s Supp. Br. at 4, ECF No. 28.

applicable law." Am. Compl. ¶ 20.  And it largely relies on an attachment to the Complaint for the substantive details of its claim.  Am. Compl. ¶¶ 15, 30; Pl.'s Ex. A.

The Government requests that the Court dismiss Plaintiff's Amended Complaint pursuant to RCFC 12(b)(6).  *See* Def.'s Mot. at 1.  It argues that the Amended Complaint fails to state a claim upon which relief may be granted because HDCC bore the risk for increased contract costs as a matter of law under this fixed-price contract, Plaintiff does not plausibly allege any directed or constructive changes to the Contract, and no other Contract provision justifies relief.  For the reasons set forth below, this Court agrees.

### A.    Legal Background

#### 1.    Standard of Review

To survive a motion to dismiss, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Erickson v. Pardus*, 551 U.S. at 93–94.

#### 2.    Firm Fixed-Price Contracts

At its center, this case involves responsibilities and liabilities under a firm-fixed price design-build contract.  Am. Compl. ¶ 4; Def.'s App. at 13, 170, 218.  It is a "well-settled rule that in a fixed-price contract, the contractor bears the risk that its actual cost of performance might exceed the contract price." *Agility Def. & Gov't Servs., Inc. v. United States*, 115 Fed. Cl. 247, 249 (2014).  Firm fixed-price contracts "provide[] for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  FAR 16.202-1.  "Because fixed-price contracts do not contain a method for varying the price of the contract in the event of unforeseen circumstances, they assign the risk to the contractor that the actual cost of performance will be higher than the price of the contract." *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996).

Plaintiff assumed the risk of delays, increased costs, and the assessment of liquidated damages associated with the failure to timely complete contract performance.  Absent plausible factual allegations indicating the Government changed the Contract requirements—or that Plaintiff is entitled to compensation under another specified contract provision—HDCC cannot obtain an equitable adjustment to recover these losses as a matter of law.  *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016).

#### 3.    Equitable Adjustments Under the Changes Clause

Under the Contract's Changes clause, a contractor can obtain an equitable adjustment for an "increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under [the] contract" when the Government orders a change to the work. FAR 52.243-4(d).  In general, to receive an equitable adjustment under the Changes clause, a

plaintiff must "demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably unforeseeable in the light of all the information available to the contractor." *Sterling Millwrights, Inc. v. United States*, 26 Cl. Ct. 49, 72 (1992) (citations omitted). A plaintiff "must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change." *Id.*

Typically, "[i]n order for the Changes clause to apply, there must have been a change in the form of a 'written or oral order . . . from the Contracting Officer that causes a change.'" *Bell/Heery v. United States*, 739 F.3d 1324, 1334 (Fed. Cir. 2014) (quoting FAR 52.243-4). Here, the Amended Complaint does not plausibly allege that the Government made any written or oral order for changes to the work. Rather, Plaintiff seeks relief under the constructive change doctrine. *See* Pl.'s Resp. at 9; Pl.'s Ex. A at 9 n.10. "A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *see also Bell/Heery*, 739 F.3d at 1335; *Zafer Taahhut*, 833 F.3d at 1361 (quoting *NavCom Def. Elecs., Inc. v. England*, 53 Fed. App'x 897, 900 (Fed. Cir. 2002)).

Many of Plaintiff's claims depend upon the theory of constructive acceleration. Constructive acceleration is a type of constructive change that "arises when the government requires the contractor to adhere to the original performance deadline set forth in the contract even though the contract provides the contractor with periods of excusable delay that entitle the contractor to a longer performance period." *Fraser Const. Co. v. United States*, 384 F.3d 1354, 1361 (Fed. Cir. 2004). A contractor must show, among other things, that it "encountered a delay that is excusable under the contract." *Id.* at 1361. An excusable delay "'arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor,' including 'acts of the Government in either its sovereign or contractual capacity.'" *E.g. Nova Grp./Tutor-Saliba v. United States*, 159 Fed. Cl. 1, 53 (2022) (quoting FAR 52.249-10(b)(1)). Notwithstanding the excuse, a plaintiff must "prove that it took reasonable action to perform the contract." *Int'l Elecs. Corp. v. United States*, 646 F.2d 496, 510 (Ct. Cl. 1981) (citing *United States v. Brooks-Callaway Co.*, 318 U.S. 120 (1943)).

### 4.      Breach of Contract

Plaintiff contends that the Government breached the Changes clause when the contracting officer denied its CDA claim for an equitable adjustment. *See* Am. Compl. ¶¶ 18–20. "A breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Bell/Heery*, 739 F.3d at 1330. On a motion to dismiss, this Court interprets a contract's provisions to determine whether the factual allegations in the complaint, if true, would establish a breach of contract. *Id.*; *see also S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss."). When interpreting a contract, this Court gives clear and unambiguous contract terms their plain and ordinary meaning and construes the contract "in

a manner that gives meaning to all of its provisions and makes sense." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).

### 5.    Implied Duty of Good Faith and Fair Dealing

In part, Plaintiff supports its claims under the Changes clause in Count I—in particular, the "government fault" element—and its breach of contract claims in Count II with allegations that the Government breached the implied duty of good faith and fair dealing by causing unreasonable delay. *See* Pl.'s Ex. A at 13–14. As the United States Court of Appeals for the Federal Circuit explains, "[t]he covenant [of good faith and fair dealing] imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). Both the "duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010). "What is promised or disclaimed in a contract helps define what constitutes 'lack of diligence and interference with or failure to cooperate in the other party's performance.'" *Solaria Corp. v. United States*, 123 Fed. Cl. 105, 119–20 (2015) (quoting *Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014)).

### B.    Analysis

The Amended Complaint fails to state a claim that the Government required HDCC to perform work outside of its contractual requirements. The setbacks HDCC alleges it encountered during contract performance—problems with the timing and content of finalized ROWs, obtaining necessary permits, relocating utilities, and negotiating work on several retaining walls—were both HDCC's sole responsibility under the firm fixed-price Contract and reasonably foreseeable. HDCC does not allege that the Government directed it to obtain permits or gather ROWs that were not contemplated by the Contract. Nor does it allege that it incurred overtime premiums caused by accelerating construction. Moreover, nothing in the Amended Complaint implies that representatives of CFLHD or HDOT acted unfairly or bad faith. Accordingly, the Amended Complaint must be dismissed.

### 1.    Claims for Delays in Securing the Final Rights of Way and for Changes to the Rights of Way

Plaintiff gives myriad reasons it believes the Government was responsible for the delays and increased costs HDCC experienced during contract performance:

- "The Government failed to secure the necessary ROWs prior to issuing the notice to proceed, "which delayed final road design, preparation and execution of appropriate

Rights of Entry agreements and commencement of construction activities" Pl.'s Resp. at 6 (citing Pl.'s Ex. A at 5–6).

- The Government's failure to timely secure the ROWs "result[ed] in changes to the permitting requirements/standards from those reasonabl[y] anticipated by HDCC at the time of bidding which in turn caused delays and increased costs associated with the permitting process." Pl.'s Resp. at 6 (citing Pl.'s Ex. A at 9–10).

- In addition to failing to secure ROWs in a timely manner, "[t]he Government made changes to ROWs upon which HDCC based its bid which resulted in delays and additional design and other compensable costs." Pl.'s Resp. at 6 (citing Pl.'s Ex. A at 7–9).

The Court construes these claims as constructive change arguments, as the Amended Complaint does not allege that the Government gave a written or oral change order that caused delay or changed the ROW specifications. *See Agility Def.*, 115 Fed. Cl. at 251. These allegations fail to state a claim upon which relief may be granted under the Changes clause. Plaintiff does not allege facts that demonstrate either that HDCC performed work outside of the contract requirements or that HDCC experienced unforeseeable, excusable delay caused by the Government's acts or omissions.

 HDCC vaguely asserts that CFLHD and HDOT made "verbal and written representations" during the procurement process that the Agency would secure title to ROWs prior to issuing the notice to proceed. Pl.'s Ex. A at 6. It relies on language in the October 1, 2015 RFQ, which stated that "[t]he right-of-way acquisition is expected to be complete prior to the issuance of the RFP." Def.'s App. at 167; Pl.'s Resp. at 3; Pl's Ex. A at 2. However, the RFP issued on December 18, 2015, informed bidders that the Contract would require the contractor to "[p]repare right of way plans and any legal descriptions documents to facilitate the final acquisition of the design and permanent right of way to accommodate the maintenance and operation of the facility by . . . HDOT"; "[p]repare the documents according to HDOT standards and specifications"; and "[o]btain any required title work and field work to complete a boundary study if required by HDOT." Pl.'s Ex. 1 at E-27, ECF No. 28-1. By including this language in the RFP, it was clear the Government had not yet secured final ROWs. Similarly, the RFP contemplated that final ROWs would not be obtained until after the contract award, as the contractor's assistance was required to facilitate ROW design and acquisition.

While the Contract assigns the Government responsibility to obtain title to ROWs, it does not specify a date by which the Government was required to do so. *See* Pl.'s Ex. A at 5–6. Thus, HDCC is wrong to allege that the Government caused unforeseeable, and therefore excusable, delays in contravention of its express duties under the Contract. Because the Contract required HDCC's participation in securing ROWs, it was entirely foreseeable that the Government would not have finalized ROWs prior to awarding the Contract or issuing the notice to proceed. Pl.'s Ex. 1 at E-27; Def.'s App. at 96. This was a firm fixed-price, design-build contract that

unambiguously included ROW design and facilitation services as part of the contractor's scope of work.  Thus, HDCC bore the risk of increased costs and delays related to designing ROWs, securing ROWs, and adjusting construction designs based on preliminary ROW approximations in order to fit final ROWs.  Pl.'s Ex. 1 at E-27; Def.'s App. at 96.

Plaintiff also fails to allege facts that the Government's acts or omissions caused the delays, thereby violating the implied duty of good faith and fair dealing.  *See* Pl.'s Ex. A at 14.  Nor does it offer facts showing that the Government engaged in a "lack of diligence and interference with or failure to cooperate in [HDCC's] performance" to suggest that the Government was responsible for the delays.  *Metcalf*, 742 F.3d at 991.  HDCC makes only conclusory assertions that the Government caused various delays.  Without more, these allegations are insufficient for this Court to find that the Agency's acts or omissions were in bad faith.  *Figueroa v. United States*, 57 Fed. Cl. 488, 497 (2003), *aff'd*, 466 F.3d 1023 (Fed. Cir. 2006) ("[L]egal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." (quoting *Blaze Constr., Inc. v. United States*, 27 Fed. Cl. 646, 650 (1993)) (cleaned up)).

Moreover, Plaintiff cites inapposite cases to support its claim that it is entitled to an equitable adjustment where the Government issued late ROWs.  In these cases, courts found contractors entitled to an equitable adjustment because the government failed to furnish ROWs by an explicit deadline.  *See Am. Line Builders, Inc. v. United States*, 26 Cl. Ct. 1155, 1163, 1205 (1992) (finding entitlement where the government missed an agreed-upon deadline to provide ROWs); *see also Appeal of Erickson Air Crane Co. of Washington, Inc.*, EBCA No. 50-6, 83-1 B.C.A. (CCH) ¶ 16145, 1983 WL 9353 (E.B.C.A. Sept. 30, 2982) (involving a contract that also specified a deadline for the government to provide the ROW).  Here, however, the parties never agreed upon a specific date.  Moreover, the Government did not represent that the ROW documents provided in the RFP—the Declaration of Future Dedication Commitment and Alternative No. 3 Profile—were final ROWs.  *See* Pl.'s Ex. 1 at E-27 (RFP clause 111.11); Def.'s App. at 96 (Contract clause 111.11); *see also* Pl.'s Ex. A at 6 n.7 (when asked at the Q&A stage of the procurement process whether "all right-of-way acquisition has been obtained," the Agency referred bidders to the Contract language regarding "ROW engineering required by contractor" and stated that the "[f]uture dedication allows construction to commence concurrently").

HDCC also blames the delays and increased costs to obtain Clean Water Act Section 404 permits ("404 permits") on the Government's alleged failure to timely secure final ROWs.  Pl.'s Ex. A at 9.  Specifically, HDCC alleges that it was not able to submit its 404-permit application in line with its preferred schedule because the permit application required details that could only be found in the final ROWs.  *Id.*  Before HDCC was able to obtain the ROWs and submit its permit application, the local regulations governing the 404-permit requirements expired and new, more stringent regulations were put in place.  *Id.* at 10.  HDCC claims that it suffered delays and increased costs to comply with the heightened permitting requirements, which it would not have experienced had it been able to submit its permit application under the old regulations.  *Id.*

Under the Contract's Permits and Responsibilities clause, HDCC was, "without additional expense to the Government, . . . responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." FAR 52.236-7.  While this clause "can be constrained by other contractual provisions that specifically limit the scope of the contractor's obligations for permitting requirements," *see Bell/Heery*, 739 F.3d at 1331, Plaintiff would need to plausibly allege that the late ROWs changed the Contract or resulted in excusable delay.  It fails to do so.  Thus, the Changes clause does not relieve HDCC of its obligations under the Permits and Responsibilities clause.

Additionally, Plaintiff does not credibly allege that the contract requirements or site conditions were materially different from the ROW information in the RFP.  *See Sterling Millwrights*, 26 Cl. Ct. at 72.  It is clear that these were not the final ROWs.  *See* Pl.'s Ex. 1 at E-27 (RFP clause 111.11); Def.'s App. at 96 (Contract clause 111.11); *see also* Pl.'s Ex. A at 6 n.7.  The need to adjust the ROW design to fit within the final ROW was foreseeable under the RFP's and Contract's requirements for ROW design and facilitation services.  *Sterling Millwrights*, 26 Cl. Ct. at 72 (providing that an equitable adjustment for differing site conditions requires the materially different conditions to be reasonably unforeseeable); Pl.'s Ex. 1 at E-24 (RFP clause 111.05. Geometric Requirements); E-27 (RFP clause 111.11); Def.'s App. at 93 (Contract clause 111.05. Geometric Requirements), 96 (Contract clause 111.11).

In its CDA claim, Plaintiff invokes the *Spearin* doctrine, under which a contractor is entitled to compensation and additional time for changes caused by defective plans or specifications.  *United States v. Spearin*, 248 U.S. 132 (1918).  That doctrine concerns the "implied warranty that if the specifications are followed an acceptable result will be produced," which arises only in cases where "a government contract contains detailed design specifications, as opposed to performance specifications."  *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1344 (Fed. Cir. 2008).  Here, the *Spearin* doctrine does not apply because the instant design-build contract contains only performance specifications.  *See* Def.'s App.; Pl.'s Ex. B at 52.  In sum, Plaintiff has not identified any legal or factual basis that entitles it to recover on its ROW claims.

## 2.    Utility Relocation Delay Claim

Plaintiff asserts that the Contract required the Government "to timely execute and enforce its agreements with public utility companies" to relocate utilities, and its failure to do so "resulted in delays in HDCC's completion [of] the final roadway configurations at the Southern Terminal and Hokiokio and additional costs entitling HDCC to an excusable and compensable time extension and additional costs."  Pl.'s Resp. at 6 (citing Pl.'s Ex. B at 40–49).  Plaintiff alleges that it notified the utility company that owned telephone lines at the Project's Southern Terminus that its poles and overhead lines had to be relocated by October 2017.  Pl.'s Ex. A at 11.  Plaintiff also allegedly notified the utility companies that owned conflicting utilities at the

Hokiokio Street portion of the Project that their poles and overhead lines had to be relocated no later than August 4, 2017.  *Id.* at 12.  However, the Southern Terminus utility was not relocated until May 11, 2018, and the Hokiokio Street utilities were not relocated until July 11, 2018.  *Id.*

The Amended Complaint fails to state a claim under the Changes clause for recovery of increased costs due to delays in these utility relocations.  It does not allege facts demonstrating that these delays were excusable due to the Government's acts or omissions in violation of the contract's express terms or the implied duty of good faith and fair dealing.  HDCC points to no contractual provision or authority obligating the Government to compel third-party utility companies to complete utility relocations within HDCC's preferred schedule.  The Contract required the contractor to "prepare utility agreements for CFLHD, to be executed by HDOT," but made no assurances that CFLHD or HDOT would ensure the utility companies' adherence to HDCC's schedule.  Def.'s App. at 80 (Contract clause 107.02, Protection and Restoration of Property and Landscape).  The Contract specifies that HDCC was responsible for "[c]ooperat[ing] with utility owners to expedite the relocation or adjustment of their utilities to minimize interruption of service, duplication of work, and delays if relocations or adjustments are needed."  *Id.*  The firm fixed-price nature of the Contract assigned HDCC the risk of utility relocation delays.  Thus, Plaintiff's claim must fail.

### 3.   Maui Electric Company Wall and Castleton Wall Excusable Delay Claim (Time Only)

HDCC's final claim is a request for excusable days of delay and remission of liquidated damages, but not increased costs.  Pl.'s Resp. at 20; Pl.'s Ex. A at 12–13.  It alleges that "the Government caused delays associated with changes to the work involving the Maui electrical and Kai Hele Ku [Castleton] retaining walls."  Pl.'s Resp. at 6; *see also* Pl.'s Ex. A at 12–13.  Specifically, HDCC asserts:

> [W]hile the Project achieved actual Substantial Completion on July 24, 2018, there remained two forms of wall work associated with neighboring properties.  The first was for the Castleton property which the Government was negotiating with the neighboring landowner over its request for a different, terraced [wall] to its property [as opposed to the graded slopes HDCC had already completed under the Contract].  The second were Government requested changes to the MECO [Maui Electric Company] wall work for another adjacent property.  HDCC priced both of these changes to the wall work to be performed at the same time, but the Government delayed and kept HDCC on standby for 482 days and then it instructed HDCC not to perform the Castleton [terrace] wall work [because it decided to give that work to another contractor], and HDCC was forced to perform the Government's changes to the MECO wall work without an approved change order.

Pl.'s Resp. at 15; *see also* Pl.'s Ex. A at 12–13.  It is unclear—and the parties disagree about— whether the MECO wall work was part of HDCC's original scope of work.  *Compare* Pl.'s Ex. C

at 49 *with* Pl.'s Ex. B at 72.  Consequently, they disagree as to whether HDCC's need to make changes to the MECO wall after Substantial Completion constituted a change to the Contract requirements.  *Compare* Pl.'s Ex. C at 49 *with* Pl.'s Ex. B at 72.  Neither party cites to any RFP or contract provision to support its position on what work relating to the MECO wall was included in the base Contract.[5]

HDCC argues that the MECO wall work changed the contract requirements because "only grading [for the MECO utility boxes] was included in the base Contract," but "[t]he approved grading change to the Castleton driveway [associated with the terraced wall construction] required construction of a block wall at the utility boxes per MECO requirements." Pl.'s Ex. C at 62.  Based on this assumption, HDCC argues that it "could not proceed with the changed work without a contract modification" and "[t]he reason the MECO wall was delayed was because CFL[HD] would not provide an approved change modification to proceed." *Id.* HDCC further explains that the "additional wall work at the MECO location . . . used the same block as the proposed [Castleton terraced] wall construction," and it believed both of these work items "would be covered under the same contract modification."  Pl.'s Ex. C at 63.  Therefore, HDCC decided to complete this work simultaneously. *Id.*  It states that "[w]hile awaiting direction from CFL[HD]," a survey revealed an issue with a different retaining wall on another part of the Castleton property and HDCC began "work[ing] on a minor redesign" to increase the wall height. *See id.*  It chose to complete the work to increase the height of the other Castleton retaining wall "in conjunction with the pending Contract Modification [i.e. MECO wall and Castleton terraced wall] work." *Id.*

Because HDCC had various work—and additional anticipated work—to complete in close geographic proximity, "HDCC recommended, and CFL[HD] accepted that this remaining base work be delayed:" (1) "[s]o that all work is completed at the same time, or pacing the work to complete when the change order work finishes"; (2) "[t]o efficiently use [HDCC's] resources"; and (3) "[t]o manage and reduce the cost of equipment mobilization and use."  Pl.'s Ex. C at 63.  HDCC states that this arrangement "was an economic decision that was beneficial to both HDCC and CFL." *Id.*

The COFD claims that the MECO wall "was part of HDCC's original scope of work and was entirely unrelated to the Castleton Terrace Wall issue, other than the fact that the MECO wall was in the same vicinity as the Castleton Terrace Wall.  HDCC's failure to complete the MECO Wall work is unrelated to the Castleton Terrace Wall, which both parties had agreed was added work."  Pl.'s Ex. B at 67.  The COFD further explains that the work to increase the other

---

[5]  It is unclear whether Plaintiff's claim for excusable delay encompasses a claim that the MECO wall work was changed work, either under a traditional or constructive change analysis. However, the Court interprets Plaintiff's claim for time only as a claim for excusable days associated with its negotiation of the various wall work items with the Agency.  Because Plaintiff does not appear to request compensation for the "additional" or "changed" work to the MECO or Castleton walls, the Court does not address whether the MECO wall work was, or was not, a base Contract requirement.

Castleton retaining wall's height after HDCC discovered issues with the wall during a survey was original Contract work. *Id.* The Agency argues that "HDCC did not diligently pursue this work to complete the original Contract requirements. . . . This delay in completing Contract requirements is concurrent with the MECO Wall delay." *Id.* The Government contends that Plaintiff's "unilateral" decision to delay both the base Contract work and the added work "while waiting to see if it would obtain a separate contract to also complete" the Castleton terraced wall was a "business decision." Def.'s Reply at 9. Thus, it concludes that "HDCC cannot state a claim for relief against the Government as a result of HDCC's own business decision." *Id.*

HDCC does not plead sufficient facts to demonstrate excusable delay. The alleged facts, even when taken as true, indicate that HDCC intentionally contributed to the delay and that HDCC did not continue to perform the contract despite its pending disputes with the Agency as required under the Contract's Disputes clause. Pl.'s Ex. C at 52–54; FAR 52.233-1, Disputes (July 2002) – Alternate I (Dec. 1991) ("The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action rising under or relating to the contract, and comply with any decision of the Contracting Officer."); *see also Int'l Elec. Corp.*, 646 F.2d at 510; *Nova Grp./Tutor-Saliba*, 159 Fed. Cl. at 53. HDCC indicates that it submitted multiple proposals and requests for contract modification orders, equitable adjustments, and excusable delay associated with the various wall work issues. Pl.'s Ex. C at 52–54. However, it admits that it chose to delay performance of certain items dependent upon resolution of these requests to the Agency, or in order to benefit itself and the Agency economically. *See* Pl.'s Ex. C at 52. HDCC had control over the schedule in this design-build Contract. Finally, it fails to allege facts suggesting that the Government acted in bad faith in taking time to make decisions regarding the additional Castleton wall work or to resolve HDCC's various requests.

## IV.   Conclusion

As explained above, Plaintiff has failed to plausibly allege that there were Government directed changes to the Contract. What HDCC interprets as changes are, in fact, obstacles that arose during contract performance which deviated from assumptions HDCC held at the time of its bid. Under the Contract, HDCC was solely responsible for the costs associated with addressing these obstacles. Therefore, the Amended Complaint does not state a claim for an equitable adjustment under the Changes clause (Count I) or for breach of the Changes clause (Count II). The Amended Complaint also fails to plausibly allege facts demonstrating that the underlying Government acts and omissions that led to the alleged changes were in bad faith.

Accordingly, the Government's Motion to Dismiss the Amended Complaint is **GRANTED**, and the case is **DISMISSED without prejudice**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

 s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge